**JUDGE SWEET**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOLLY ROGER OFFSHORE FUND and JOLLY
ROGER FUND LP, Individually And
On Behalf of All Others Similarly Situated,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**07 CIV 3923**

**CIVIL ACTION NO.** _____

Plaintiffs,

vs.

BKF CAPITAL GROUP, INC.,
GLENN A. AIGEN and JOHN A. LEVIN,

Defendants.

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

RECEIVED
MAY 18 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.    This is a federal class action on behalf of purchasers of the common stock of BKF
Capital Group, Inc ("BKF Capital" or the "Company") between May 10, 2004 and October 18,
2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act
of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false
and misleading statements that defendants knew and/or recklessly disregarded were false and
materially misleading at the time of publication, and that omitted to reveal material information
necessary to make defendants' statements, in light of such material omissions, not materially false
and misleading.

**OVERVIEW**

2.     Throughout the Class Period, BKF Capital, through its wholly owned subsidiary, John A. Levin & Co., Inc., operated as an investment adviser primarily in the United States. The Company managed equity portfolios for institutions and wealthy individual investors, as well as a range of alternative investment products and other specialized investment programs. BKF Capital's clients included United States and foreign corporations, mutual funds, limited partnerships, universities, pension and profit sharing plans, individuals, trusts, not-for-profit organizations, and foundations.

3.     Defendant John Levin began his Wall Street career as an analyst at Loeb, Rhodes in the early 1970's. John Levin built up and managed his hedge fund, John A. Levin & Co., and later merged it with Baker, Fentess & Co. By the inception of the Class Period, the firm combined about $9 billion of "long only" assets and $3.5 billion in hedge fund assets. In the years leading up to the inception of the Class Period, the fund was poised to reap the rewards of the then-ongoing, money management "boom" that existed in the five years preceding the Class Period. During 2004, however, the Company did not participate in that "boom." Instead, BKF Capital reported a loss of $858,000 for the year.

4.     Despite defendants' poor management performance, in the period leading up to the inception of the Class Period defendants and other Company insiders received millions of dollars in salary and other compensation. In addition to the millions of dollars in salary and bonuses paid to defendant John A. Levin (then Chairman and CEO) and defendant Glenn A Aigen (then Chief Financial Officer), during 2004, Henry L. Levin, the son of defendant John Levin, also received $800,000 as salary and $5,963,944 as bonus compensation as one of two Senior Portfolio Managers for the Company's "event driven" investment group. During 2004, John Rango, another Senior

2

Portfolio Manager, together with Henry Levin received approximately $8.1 million in compensation from the Company, and together they had also demanded a guarantee of $10 million for management fees, for 2005, according to media reports.

5.    As salaries and expenses soared at BKF Capital, returns dwindled, increasing the pressure on defendants to produce more positive returns for investors during the Class Period. The Company's largest single shareholder, Steel Partners, launched a Proxy contest to replace defendant Levin and two other members of the Company's board at the Company's 2005 Annual Shareholder Meeting. Unknown to investors, however, these pressures caused defendants to issue materially false and misleading financial reports that violated Generally Accepted Accounting Principles.

6.    It was only at the end of the Class Period, however, that investors ultimately learned that defendants had failed to control the operations and financial reporting at the Company. On October 19, 2005, before the market opened, defendants revealed in a press release that the Company's financial reports, previously filed with the SEC were not reliable and that the financial reports dating back to the beginning of 2004 would need to be restated.

7.    These disclosures caused the price of BKF Capital shares to decline over $7.40 per share in one day, falling over 30%, and closing at just above $17.00 per share. Moreover, as the true facts about the Company became known to investors and as the full impact of defendants' scheme finally impacted BKF Capital shares, the price of Company stock continued to decline - - ultimately trading at just above $3.00 per share, its trading price as of the filing of this action.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). BKF Capital maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

11. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12. Plaintiff Jolly Roger Offshore Fund and Jolly Roger Fund LP, as set forth in the accompanying certifications, incorporated by reference herein, purchased the common stock of BKF Capital at artificially inflated prices during the Class Period and has been damaged economically.

13. Defendant **BKF CAPITAL GROUP, INC.,** is a Delaware corporation with its principal place of business and chief executive offices located at One Rockefeller Plaza, New York, NY 10020. According to the Company's profile, during the Class Period, BKF Capital through its wholly owned subsidiary, John A. Levin & Co., Inc., operated as an investment adviser primarily in the United States. The Company managed equity portfolios for institutional and large individual investors, as well as a range of alternative investment products and other specialized investment programs. BKF Capital's clients included United States and foreign corporations, mutual funds, limited partnerships, universities, pension plans, individuals, trusts, not-for-profit organizations, and foundations.

4

14.    Defendant **JOHN A. LEVIN** ("Levin") was, during the Class Period, Chairman of the Board of the Company and later Chairman Emeritus, and Consultant and Chairman and CEO of Levin Management Co. Inc., and Chairman and CEO of John A. Levin & Co. Inc.  During the Class Period, defendant Levin signed the Company's SEC filings, including but not limited to BKF Capital's Form 10-K.

15.    Defendant **GLENN A. AIGEN** ("Aigen") was, during the Class Period, Chief Financial Officer and Senior Vice President of the Company, as well as Chief Financial Officer of John A. Levin & Co. and of Levin Management.  During the Class Period, defendant Aigen signed the Company's SEC filings, including but not limited to BKF Capital's Form(s) 10-Q and Form 10-K.

16.    The individual defendants referenced above are referred to herein as the "Individual Defendants."

17.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

18.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of BKF Capital, by virtue of their high-level positions with the Company, directly participated in the management of

the Company, was directly involved in the day-to-day operations of the Company at the highest
levels and was privy to confidential proprietary information concerning the Company and its
business, operations, products, growth, financial statements, and financial condition, as alleged
herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the
false and misleading statements and information alleged herein, were aware, or recklessly
disregarded, that the false and misleading statements were being issued regarding the Company, and
approved or ratified these statements, in violation of the federal securities laws.

19.     As officers and controlling persons of a publicly-held company whose common
stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the
New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities
laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful
information with respect to the Company's financial condition and performance, growth,
operations, financial statements, business, products, markets, management, earnings and present and
future business prospects, and to correct any previously-issued statements that had become
materially misleading or untrue, so that the market price of the Company's publicly-traded common
stock would be based upon truthful and accurate information. The Individual Defendants'
misrepresentations and omissions during the Class Period violated these specific requirements and
obligations.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval
of the various public and shareholder and investor reports and other communications complained of
herein and were aware of, or recklessly disregarded, the misstatements contained therein and
omissions therefrom, and were aware of their materially false and misleading nature. Because of
their Board membership and/or executive and managerial positions with BKF Capital, each of the
Individual Defendants had access to the adverse undisclosed information about BKF Capital's

6

business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about BKF Capital and its business issued or adopted by the Company materially false and misleading.

21.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BKF Capital common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding BKF Capital's business, operations, management and the intrinsic value of BKF Capital common stock; (ii) artificially inflated the price of Company shares by issuing materially false and misleading statements; and (iii) caused plaintiff and other members of the Class to purchase BKF Capital common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of BKF between May 10, 2004 and October 18, 2005, inclusive (the

"Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BKF Capital common shares were actively traded on the NYSE. As of September 30, 2005, the Company had over 7.83 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BKF Capital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

8

(b)      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of BKF Capital; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

28.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### Defendants' Materially False and Misleading Statements Made During the Class Period

29.    **1Q:04 Results.**  On or about May 10, 2004, the inception of the Class Period, BKF Capital published a release announcing that it had filed with the SEC its financial report for the fiscal first quarter ended March 31, 2004, signed and certified by defendants Levin and Aigen.  In addition to reporting solid revenues, earnings and earnings per share, the 1Q:04 Form 10-Q also stated, in part, the following:

1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - - ORGANIZATION AND BASIS OF PRESENTATION

**The consolidated interim financial statements of BKF Capital Group, Inc. *(formerly Baker, Fentress & Company, hereto referred to as "BKF" or the "Company") and its subsidiaries included herein have been prepared in accordance with generally accepted accounting principles for interim financial information and Rule 10-01 of Regulation S-X.*...** In the opinion of management, the consolidated financial statements reflect all adjustments, which are

of a normal recurring nature, necessary for a fair presentation of the financial condition, results of operations and cash flows of the Company for the interim periods presented and are not necessarily indicative of a full year's results. [Emphasis added.]

30.    **Controls.** The 2Q:05 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

### ITEM 4. CONTROLS AND PROCEDURES

An evaluation was performed under the supervision and with the participation of BKF's management, including the CEO and CFO, of the effectiveness of the design and operation of BKF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). **Based on that evaluation, BKF's management, including the CEO and CFO, concluded that BKF's disclosure controls and procedures were effective as of the end of the period covered by this report.** There have been no changes in BKF's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during BKF's most recent quarter that has materially affected, or is reasonably likely to materially affect, BKF's internal control over financial reporting. [Emphasis added.]

31.    **Certifications.** In addition to the foregoing, the 2Q:05 Form 10-Q also contained certifications by defendants Levin and Aigen, respectively, that attested to the purported accuracy and completeness of BFK Capital's financial and operational reports, as follows:

### [ CERTIFICATIONS ]

1.    I have reviewed this quarterly report on Form 10-Q of BKF Capital Group, Inc.;

2.    **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3.    **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;**

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report in being prepared;

b)    **Designed such internal control over financial reporting, or** *caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosures controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)    **All significant deficiencies and material weaknesses in the** *design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;* and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**BKF CAPITAL GROUP, INC.**
**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of BKF Capital Group, Inc. (the "Company") on Form 10-Q for the period ending March 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John A.

Levin, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350 (including subsections (a) (b) and (c) thereof), as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    **The information contained in the Report fairly presents, in all material** *respects, the financial condition and results of operations of the Company*.

32.    Unbeknownst to investors, the statements contained in BKF Capital's May 10, 2004 Form 10-Q, referenced above, were each materially false and misleading when made and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)    Throughout the Class Period, as a result of defendants' failure to properly account for their restricted stock units, it was not true that the Company's financial statements and reports were prepared in accordance with GAAP ad SEC rules;

(b)    Throughout the Class Period, as a result of defendants' failure to properly account for their restricted stock units, the Company's financial reports were not reliable and did not represent the true financial and operational condition of the Company at that time; and

(c)    Throughout the Class Period, as a result of defendants' failure to properly account for their restricted stock units, it was also not true that BKF Capital contained adequate systems of internal operational or financial controls, such that BKF Capital's reported financial statements were true, accurate or reliable.

33.    **2Q:04 Results**.  On or about August 9, 2004, BKF Capital filed with the SEC its financial and operational results for the fiscal second quarter ended June 30, 2004, signed and certified by defendants Levin and Aigen.  In addition to reporting solid revenues, earnings and earnings per share, and also in addition to containing certifications that were substantially similar to

12

those filed with the SEC previously, the Company's 2Q:04 Form 10-Q also stated, in part, the
following:

    1.     Organization and Summary of Significant Accounting Policies

Organization and Basis of Presentation

The consolidated interim financial statements of BKF Capital Group, Inc. (formerly
Baker, Fentress & Company, hereto referred to as "BKF" or the "Company") and its
subsidiaries included herein have been prepared in accordance with generally
accepted accounting principles for interim financial information and Rule 10-01 of
Regulation S-X.

*   *   *

Item 4.     **Controls and Procedures**

An evaluation was performed under the supervision and with the participation of
BKF's management, including the CEO and CFO, of the effectiveness of the design
and operation of BKF's disclosure controls and procedures (as defined in Rules 13a-
15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). Based
on that evaluation, BKF's management, including the CEO and CFO, concluded
that BKF's disclosure controls and procedures were effective as of the end of the
period covered by this report. There have been no changes in BKF's internal control
over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the
Securities Exchange Act of 1934, as amended) that occurred during BKF's most
recent quarter that has materially affected, or is reasonably likely to materially affect,
BKF's internal control over financial reporting.

    34.     The statements made by defendants and contained in the Company's 2Q:04 Form
10-Q were materially false and misleading and were know by defendants to be false at that time, or
were recklessly disregarded as such, for the reasons stated herein in ¶32, *supra*.

    35.     **3Q:04 Results.** On or about November 9, 2004, BKF Capital filed with the SEC, its
financial and operational results for the fiscal third quarter 2004 ended September 30, 2004, signed
and certified by defendants Levin and Aigen. In addition to reporting solid revenues, earnings and
earnings per share, and also in addition to containing certifications that were substantially similar to
those filed with the SEC previously, the Company's 3Q:04 Form 10-Q also stated, in part, the
following:

1.    Organization and Summary of Significant Accounting Policies

Organization and **Basis of Presentation**

The consolidated interim financial statements of BKF Capital Group, Inc. (formerly Baker, Fentress & Company, hereto referred to as "BKF" or the "Company") and its subsidiaries included herein have been prepared in accordance with generally accepted accounting principles for interim financial information and Rule 10-01 of Regulation S-X.

\*    \*    \*

Item 4.    **Controls and Procedures**

An evaluation was performed under the supervision and with the participation of BKF's management, including the CEO and CFO, of the effectiveness of the design and operation of BKF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). Based on that evaluation, BKF's management, including the CEO and CFO, concluded that BKF's disclosure controls and procedures were effective as of the end of the period covered by this report. There have been no changes in BKF's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during BKF's most recent quarter that has materially affected, or is reasonably likely to materially affect, BKF's internal control over financial reporting. [Emphasis added.]

36.    The statements made by defendants and contained in the Company's 3Q:04 Form 10-Q were materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶32, *supra*.

37.    On February 14, 2005, the Company's largest shareholder, Steel Partners published a release announcing that it had served notice to the Company that it intended to nominate three individuals for election to the BKF Board at the 2005 Annual Meeting of Stockholders.   Steel Partners II, L.P., which then owned approximately 657,000 BFK Capital shares, or approximately 9.2% of the common stock, had sent a letter to defendants serving notice of its intention to nominate Warren G. Lichtenstein, Ronald LaBow and Kurt N. Schacht for election to the BKF Board of Directors at BKF's 2005 annual meeting of stockholders.

38.    **4Q & FY:04 Results**.  On or about March 17, 2005, BKF Capital filed with the SEC

its financial and operational results for the fourth fiscal quarter and full year ended December 31,

2004, signed and certified by defendants Levin and Aigen.  In addition to reporting solid revenues,

earnings and earnings per share, and also in addition to containing certifications that were

substantially similar to those filed with the SEC previously, the Company's 2004 Form 10-K also

stated, in part, the following:

ITEM 9A.    **CONTROLS AND PROCEDURES**

MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL
REPORTING

BKF's management is responsible for establishing and maintaining adequate internal
control over financial reporting, as such term is defined in Exchange Act Rule 13a-
15(f). U*nder the supervision and with the participation of management,
including the Chief Executive Officer and Chief Financial Officer, BKF
conducted an evaluation of the effectiveness of its internal control over
financial reporting based on the framework in Internal Control* – Integrated
Framework, issued by the Committee of Sponsoring Organizations of the Treadway
Commission ("COSO Framework"). **Based on our evaluation under the COSO**
*Framework, management concluded that BKF's internal control over
financial reporting was effective as of December 31, 2004.*

CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

**There have been no changes in BKF's internal control over financial reporting**
(as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of
1934, as amended) that occurred during BKF's most recent quarter that has
materially affected, or is reasonably likely to materially affect, BKF's internal control
over financial reporting. [Emphasis added.]

39.    The statements made by defendants and contained in the Company's 2004 Form 10-

K were materially false and misleading and were known by defendants to be false at that time, or

were recklessly disregarded as such, for the reasons stated herein in ¶32, *supra*.

40.    In response to the challenge by Steel Partners, on April 6, 2005, defendants

published a release advising Company shareholders to oppose the Steel Partners bid for control over

the Company.  This release stated, in part, the following:

The Company stated, **"Our success is a result of a disciplined *approach to investment research, a commitment to recruit top-tier investment talent and the cultivation of solid long-term client relationships*.** Under the leadership of our management team and Board of Directors, we are building on our position as a well-respected asset management firm, while competing against much larger investment management organizations with deeper financial resources.

"To succeed, we must grow assets under management and increase free cash flow. As a larger company, we should be able to achieve economies of scale, which would give us greater capacity to expand margins with respect to particular investment styles. Since we derive a significant percentage of our revenues from alternative investment strategies, however, our overall margins may be structurally lower in comparison to larger money management firms focused mainly on traditional investment styles.

"Our earnings have historically lagged, and perhaps obscured, our free cash flow because of the amortization of intangible expenses relating to the 1996 merger of our investment management business with a closed-end fund. We hope that increases in our free cash flow will become more visible through our new dividend policy and at the same time allow us to invest in different areas of our business and in attractive growth opportunities. **We believe that increased assets under management and *free cash flow provide the most likely path to long term shareholder value."***

With respect to the nomination by dissident stockholder Steel Partners II, L.P. ("Steel") of three individuals for election to the BKF Capital Board of Directors, the Company added: **"A supportive stockholder base is crucial to the development *of our business. Steel Partners' hostile efforts to displace a significant part of our leadership and gain influence over BKF Capital hinder our business momentum,*** especially in light of the fact that Steel Partners is recognized not only as an investor in BKF but as a competitor with it as well. We do not see how such actions ultimately enhance value for, and serve the interests of, all stockholders. Our primary assets are our relationships with people - employees and clients - and we need to maintain an environment in which they can have the confidence to establish long term relationships with us."

The Company concluded: **"We believe that BKF is well positioned for growth. *The new dividend policy and the steps being taken with respect to corporate governance evidence our commitment to our stockholders*.** Perhaps most importantly, we believe that a supportive stockholder base will be crucial to our future success. **The Steel nominees should be rejected so that the BKF Capital *Board of Directors and management team can continue to build on the progress that has been made and stockholder value that has been created."*** [Emphasis added.]

41.    **1Q:05 Results.**  On or about May 10, 2005, BKF Capital filed with the SEC its

financial and operational results for the fiscal first quarter ended March 31, 2005, signed and

certified by defendants Levin and Aigen.   In addition to reporting solid revenues, earnings and earnings per share, and also in addition to containing certifications that were substantially similar to those filed with the SEC previously, the Company's 1Q:05 Form 10-Q also stated, in part, the following:

1.   Organization and Summary of Significant Accounting Policies

Organization and **Basis of Presentation**

**The consolidated interim financial statements of BKF Capital Group, Inc.** *(formerly Baker, Fentress & Company, hereto referred to as "BKF" or the "Company") and its subsidiaries included herein have been prepared in accordance with generally accepted accounting principles for interim financial information and Rule 10-01 of Regulation S-X.*

\*   \*   \*

**Item 4.        Controls and Procedures**

An evaluation was performed under the supervision and with the participation of BKF's management, including the CEO and CFO, of the effectiveness of the design and operation of BKF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended). **Based** *on that evaluation, BKF's management, including the CEO and CFO, concluded that BKF's disclosure controls and procedures were effective as of the end of the period covered by this report.* There have been no changes in BKF's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended) that occurred during BKF's most recent quarter that has materially affected, or is reasonably likely to materially affect, BKF's internal control over financial reporting. [Emphasis added.]

42.        The statements made by defendants and contained in the Company's April 6, 2005 Letter to Shareholders and in its 1Q:05 Form 10-Q, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶32, *supra*.

43.        Placing even more pressure on defendants, on May 26, 2005, Steel Partners announced that it had gained the support of Institutional Shareholder Services ("ISS"), the nation's leading proxy voting advisory service.   At that time, ISS had recommended that its clients vote to

elect Steel Partners' three independent nominees to the Board of Directors of the Company at the

June 9, 2005 annual meeting of shareholders. According to this release:

> ISS provides proxy advisory services to hundreds of institutional investors, mutual funds, and other fiduciaries. In its report dated May 25, 2005, ISS noted the strength of Steel Partners' slate of nominees, stating that:

> --    **"The company's less than stellar track record with respect to corporate *governance warrants the presence of Kurt Schacht on the board.*"**

> --    **"The board could use an additional layer of di*scipline and oversight provided by director nominees Warren Lichtenstein and Ronald LaBow in light of the difficulties facing the company's long-only business unit.*"**

*    *    *

> "We note that BKF did not respond fully to the shareholders' wishes for the past three years, and only made the partial step towards implementing change after Steel Partners publicly announced its intent to engage in a proxy fight. The 100% bid and TIDE amendments are not a sufficient response. At a minimum, the board should have put the pill to a binding shareholder vote this year."

*    *    *

> **"As with the poison pill, we note that the company's good governance *proposals were submitted only after Steel Partners declared its intentions to run for board seats. The timing of the reforms call into question whether the company has truly 'seen the light,' or if it is merely taking defensive steps as part of its proxy strategy."* We** find some credence to Steel Partners' argument that, if BKF was truly serious about seeing these changes approved, the company would have both publicly committed insiders to vote in favor of the proposals and in addition would have allowed enough time to conduct a full scale campaign to 'get out the vote.'" [Emphasis added.]

44.    Similarly, the same day, Glass Lewis, another leading proxy advisory service, also

published a release that announced that it too supported the Steel Partners slate of directors. This

release also stated, in part, the following:

> In its report, Glass Lewis states, **"The Company could *use some new thinking and an outside perspective in the board room." They also noted, "In our opinion, the dissidents rightly argue that the board has not effectively served shareholders in significant respects. In our view, the current board of directors had failed shareholders in choosing not to implement shareholder-approved proposals."* They** further stated, "Our analysis also suggests that the

18

compensation committee has done a poor job of linking pay with performance. **The
*top executives of the Company received over $5 million (excluding
compensation received by Henry Levin, a portfolio manager and the son of
John Levin, totaling over $8 million in 2004) while many of the performance
metrics lagged behind its peers.*"**

Warren G. Lichtenstein, the managing member of Steel Partners, stated, "This
endorsement from Glass Lewis comes on the heels of a similar endorsement that we
just received from Institutional Shareholder Services. The fact that Glass Lewis and
ISS have both recommended our nominees and corporate governance initiatives
sends a clear message to BKF's board that it's time for a change." [Emphasis added.]

45.     On June 8, 2005, defendants published a release announcing that the annual

shareholder meeting had been postponed until June 23, 2005, after the board made sweeping

changes in the Company's corporate governance and its charter. This release also stated, in part, the

following:

> **BKF Capital Group Adopts Corporate Governance Changes; Election of
> Directors is Now Only Issue in Stockholder Vote; Eliminates Classified Board
> and Rights Plan; Annual Meeting Postponed to June 23, 2005**
>
> BKF Capital Group, Inc. (NYSE:BKF) today announced that its Board of Directors
> has adopted several important corporate governance changes relating to takeover
> defenses. Recent communications with stockholders have led the Board to conclude
> that the core issue for stockholders at the Company's 2005 Annual Meeting of
> Stockholders - the election of directors that can profoundly impact the business,
> future direction and value of the Company - was being obscured by arguments
> relating to takeover defenses and the potential for a sale of the business.
>
> In that regard, BKF also reported today that earlier in 2005, as well as in 2001, the
> Board retained Merrill Lynch & Co. and Peter J. Solomon Company to explore
> strategic alternatives for BKF, including a possible sale of the Company. In 2005,
> Merrill Lynch contacted a number of firms that Merrill Lynch and the Company
> considered to be potential acquirers because of their ability to leverage the
> Company's investment businesses with their own distribution and capital. Firms
> contacted included both U.S. and foreign-based firms, all of which have active asset
> management businesses and many of which have been active acquirers of asset
> management businesses in recent years. BKF signed confidentiality agreements and
> held meetings with several of them, but none of these activities resulted in any offer
> for all or any part of the Company.
>
> The governance changes include the following:
>
> --      The BKF Board modified its original board declassification proposal by
>         making the declassification effective immediately upon stockholder approval

19

so that all directors will stand for election to one-year terms at the next annual meeting and by eliminating the supermajority vote requirement for removal of directors.

-- BKF's stockholder rights plan will be eliminated, effective as of the date of the Annual Meeting.

-- The BKF Board adopted a bylaw amendment to provide that the holders of at least 25% of the outstanding shares of the Company's common stock can require the Company to call a special meeting of stockholders. The bylaw amendment also provides that this amended provision may only be repealed, modified or amended by the stockholders.

In light of the significance of these changes, the BKF Board has postponed the Annual Meeting to June 23, 2005, from June 9, 2005, to allow stockholders time to consider the election of directors. Neither the record date for the meeting nor the shareholders entitled to vote will change. Existing proxy cards remain valid.

46.    The following day, June 9, 2005, Steel Partners issued a release that was very critical of defendants' recent actions and of their prior management over the Company. This release stated, in part, the following:

**Steel Partners Says Real Issue Confronting BKF's Shareholders is BKF's Dismal Performance and Failure to Align Compensation With Shareholder Interests**

Steel Partners II, L.P. today called the last-minute postponement of BKF Capital Group's (NYSE:BKF) 2005 Annual Meeting a *thinly-veiled attempt to cloud the real issues in the election of corporate directors*, namely the Company's **miserable operating performance and failure to tie compensation with the *interests of shareholders.***

*"While we welcome the admission by this Board into the modern world of corporate governance through the sudden adoption of corporate governance measures, the issue of the Company's continuing substandard financial performance still remains of paramount concern,"* said Warren G. Lichtenstein, the managing member of Steel Partners.

**"The fact that the Board has once again attempted to get by with as little as *possible to maintain the status quo, we believe, more than ever demonstrates the need for BKF's shareholders to elect independent directors who will adopt a real plan for cutting expenses***, aligning compensation with shareholders' interests, and eliminating related party transactions, all with the objective of enhancing profitability," he stated.

In the attached letter that is being sent to all BKF shareholders, **Steel Partners** *documents how BKF's performance has been unacceptable, compared to its peers. And yet, despite this miserable performance, BKF continues to generously reward its senior management and, on June 1, 2005, it granted golden parachutes to its General Counsel and Chief Financial Officer.*

Commenting on the corporate governance changes that were suddenly announced by BKF, Mr. Lichtenstein said, "**The fact that BKF has belatedly adopted many** *of the proposals and positions that we advocated much earlier demonstrates that Steel's advocacy is already yielding benefits for the Company's shareholders.* We believe that BKF has wasted corporate assets by resisting these corporate governance initiatives and then suddenly reversing its position and adopting these initiatives one day before the Annual Meeting." [Emphasis added.]

47.    The text of the letter from Steel Partners to the BKF Shareholders stated, in part, the

following:

## A CRITICAL MESSAGE TO
## BKF CAPITAL GROUP, INC. STOCKHOLDERS
## FROM STEEL PARTNERS II, L.P.

Do Not Let BKF's Last Minute Flip-Flop On Corporate Governance Reforms Confuse. The Real Issue At The 2005 Annual Meeting - BKF Has Failed To Address Its Dismal Operating Performance And Align Compensation With Stockholder Interests

June 9, 2005
Fellow Stockholders:

Steel Partners II, L.P. has previously written to you seeking your support at the 2005 Annual Meeting of BKF Capital Group, Inc. We are now writing in response to BKF's disturbing, last-minute postponement of the Annual Meeting originally scheduled to be held on June 9, 2005. Just one day before the Annual Meeting, BKF announced that the Board of Directors had suddenly adopted corporate governance changes that it had previously failed to address despite repeated stockholder demands. The Board has postponed the Annual Meeting to purportedly allow stockholders more time to consider the election of directors. We can only speculate as to their true motives in delaying the Annual Meeting and adopting last minute corporate governance reforms. Would any of these corporate governance reforms have been adopted without Steel Partners commencing its proxy contest?

Your support for our nominees is essential in order to continue to hold BKF and its Board accountable.

Due to your support for our nominees and the corporate governance initiatives that we are advocating, **BKF's Board has been dragged kicking and screaming,** *against their will, into the modern world of corporate governance reform.*

BKF's Board is telling you that they are making these changes at the last minute due to some recent conversations with stockholders. If they had listened earlier to some of their largest stockholders, including Steel Partners, they may have been able to make significant changes without a proxy contest. **We believe that BKF wasted** *corporate assets by fighting these corporate governance initiatives and then suddenly reversing its position and adopting these initiatives one day before the Annual Meeting.*

The Board stated that we don't have a business plan. We believe the real story is they simply don't want three independent directors on their board who will press them to adopt a real plan for cutting expenses, aligning compensation with stockholders' interests, and eliminating related party transactions, all with the objective of enhancing profitability. **We believe they don't want anyone on their board that** *will make them toe the line in order to enhance the bottom line.*

*The fact that BKF has belatedly adopted many of our proposals and positions that we advocated much earlier we believe demonstrates that our advocacy is already yielding benefits for BKF's stockholders.*

*    *    *

Related Party Transactions

We and other stockholders have expressed serious concerns with BKF's history of related party transactions. This pattern continues with the revelation in BKF's June 8 announcement that Peter J. Solomon Company was retained purportedly to assist in the sale of the company. Did the BKF Board believe that Merrill Lynch was not capable of properly exploring the sale of the company on its own? **What special** *insight or connections does Peter J. Solomon Company possess that merited the engagement of a second firm? How much will Peter J. Solomon Company be paid by BKF for these services?* As corporate governance is a key issue in this proxy contest, shouldn't this arrangement have been disclosed in BKF's proxy statement? **In fact, should a related party such as Peter J. Solomon Company** *have been retained at all?* [Emphasis added.]

48.    On or about June 16, 2005, defendant Levin responded to claims by Steel Partners that executive compensation and employee expenses at the Company, *that amounted to 77.8% of revenues last year*, were resulting in all of the firms "incremental revenue being sucked up by inflated salaries." In addition, the Levin letter also stated, that:

Dear Fellow Stockholder,

The Board of Directors of BKF recently took dramatic action to take off the table for the annual meeting all issues except the central one: which slate of candidates will produce the best board to foster the growth and success of the company. The Board (1) rescinded the poison pill, (2) modified its proposal to de-stagger the board so that all directors will be up for election in 2006 and so that directors may be removed by majority vote, and (3) amended the by-laws so that holders of 25% of the shares will have the right to call a special meeting of stockholders (to remove directors or for any other purpose). Furthermore, the Company disclosed that it had retained two investment banks to explore transactions to realize shareholder value. Why were these steps taken? **TO MAKE IT PERFECTLY CLEAR TO STOCKHOLDERS THAT THIS ELECTION IS NOT ABOUT SELLING THE COMPANY OR ANTI-TAKEOVER DEVICES, BUT ABOUT HOW TO BUILD UP A PUBLIC COMPANY.** Since the opposition slate has not offered any sort of credible business plan, stockholders should be asking them: "What's going on?"

Since Steel Partners began its attacks on the company, we have been forced to spend a great deal of time and energy with clients, employees and potential employees, trying to give them some hope that the company they have selected or are considering will be there for them. While we have needed a senior executive to strengthen our management team and increase our profits, the actions by Steel Partners have made the recruitment of such a person extremely difficult. Of course, Steel has avoided addressing the consequences of its actions, and we remain gravely concerned that a group of competitors will not be focused on developing value for all stockholders and may be interested in replacing our products with theirs. **WE JUST DO NOT BELIEVE THAT A NEW MANAGEMENT COULD REPLACE OUR SENIOR PORTFOLIO MANAGERS AND STILL RETAIN OUR CLIENTS.** The stockholders opposing us may be skilled portfolio managers with impressive track records, but the fact is that our clients have chosen our people to manage their money in a particular style. If they wanted Mr. Lichtenstein or Mr. Cannell to manage their money, they could have chosen them, and we would not at all be surprised if some of our clients do in fact have their money invested with them. But even if some of our clients have chosen Mr. Lichtenstein or Mr. Cannell to manage their money for them, it does not mean they would want them to manage a greater portion of their assets.

We think that the portfolio managers attacking us well understand the difficulty of retaining existing client assets, so we must ask whether these portfolio managers think that they can take advantage of a possible decline in our stock price (perhaps brought on by the disruption they engender) by merging one or more of their entities into our publicly traded company. Or maybe Mr. Lichtenstein sees his investment as being hedged because BKF is a potential source of direct revenues for his management business (which is owned by him, not his investors). SEC filings disclose that Mr. Lichtenstein's management company has received significant management and consulting fees from public companies where he has become Chief Executive Officer; we think that is something stockholders ought to know.

If you wonder where this distrust of the opposition slate comes from, please look at the quality of the arguments being used to attack us. The attack on Barton Biggs, a universally recognized expert on the asset management industry, for paying us rent for a limited period of time for space inside our offices we weren't utilizing and couldn't sublet was always a joke, which people understand when we discuss it. We are being attacked for paying a relatively low amount of fees to Peter Solomon's investment banking organization while these same attackers simultaneously criticize us for not pursuing strategic alternative to realize shareholder value.

With respect to the attacks on my children, I must say they reveal much about the nature of the opposition but disclose absolutely nothing improper. Much has been said about the compensation paid to my son Henry, but I just ask that stockholders evaluate him as one of two senior portfolio managers for event-driven strategies that have generated a very significant portion of our firm's revenues and free cash flow over the years. The strategies have long, established track records and importantly have attracted investors that later invested in other firm strategies. He is paid on the basis of the profitability to the firm of the strategies he manages, which is exactly how our hedge fund manager critics pay themselves. While I understand that being part of a public company must necessarily reduce the cash compensation he can earn, I don't understand why being rewarded based on the profitability of the accounts he manages is no longer a valid way of looking at things, especially when he must perform many of the same client servicing, marketing and personnel management functions that his counterparts at privately held firms perform.

*    *    *

With respect to the "losses" being generated by our business, I only ask that investors look at our business as any reasonably sophisticated investor should -- and you can be sure that the portfolio managers attacking us are sophisticated investors. Steel Partners has repeatedly stated that it does not understand how we lose money, and in the Cannell letter, the author makes the point that our business has generated over $62 million in losses since 2000. Both Mr. Lichtenstein and Mr. Cannell conveniently forget to note that the company has recorded over $91 million in expenses over that same period relating to the amortization of intangibles arising from the 1996 transaction involving our money management business and a closed-end fund. In other words, the "losses" just do not reflect the way in which our business has been managed, and they obscure the cash flow actually being generated. We understand shareholders who make inquiries as to why our cash flow is not higher, but attacks on our "losses" by sophisticated money managers betray their tendency to obscure the relevant facts to achieve their aims.

Once again: What's going on? Is BKF now in a terrible predicament because Steel Partners is looking past the potential value destruction in our particular situation in order to burnish its "activist" credentials, intimidate existing and future targets and thereby enhance its overall portfolio returns? If Steel wants to claim credit for our corporate governance reforms, then it has already done all it can. If Steel wants to force through a compensation program that drives out key personnel, then what is the real business strategy? After having brought our money management business public in a transaction that generated significant value for stockholders by

distributing approximately $700 million in assets, I am particularly pained as I watch this pack of hedge funds, pretending to be suffering and abused shareholders, continue on their destructive path, more concerned with the image that they project than with the interests of other BKF shareholders. Ever since we became a public company, we've stated that a supportive shareholder base was important to our business. I've thought that shareholders who are disappointed with management could always sell (in fact our stock has done exceedingly well), and those who have constructive proposals or valid criticisms could always make them. I can accept and understand criticism, but I don't understand attacks that so clearly destroy value.

49.    The statements made by defendants and contained in the Company's June 16, 2005 Letter to Shareholders were materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, because they failed to disclose that the Company's internal controls were inadequate and that the Company was not properly accounting for restricted stock awarded to employees. Revealing the truth at that sensitive time would have subjected defendants to further public scrutiny and attack, which defendants were desperately attempting to avoid.

50.    On June 23, 2005, however, Steel Partners' nominees to the Board of the Company were elected with overwhelming support. Steel nominees, Warren G. Lichtenstein, Kurt N. Schacht and Ronald LaBow, were supported by an approximate 2:1 margin. The new Board members replaced defendant Levin and other Board members, Burton Malkiel and J. Barton Goodwin. Defendant Levin, however, was not forced out of the Company and, instead, was immediately reappointed to the Company's Board.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF BKF CAPITAL IS BELATED DISCLOSED

51.    The truth began to be disclosed on August 10, 2005, when defendants surprised the market with the Company's announcement that it would delay the filing of its second quarter 2005 Form 10-K. The Company's Notice of Late Filing, filed with the SEC, explained its inability to file a timely report, as follows:

The quarterly report on Form 10-Q (the "Form 10-Q") of BKF Capital Group, Inc. (the "Company" or "BKF") for the quarterly period ended June 30, 2005 could not be filed within the prescribed time period because management is reconsidering the balance sheet accounting treatment of restricted stock units with respect to which the Company recorded a liability over the vesting period rather than including them in the equity section. A change in accounting treatment would reduce liabilities previously reported and increase stockholders' equity.

*    *    *

As the result of the resignation of David Grumhaus, the former Chairman of the Audit Committee, and the election of Ronald LaBow, Warren Lichtenstein and Kurt Schacht to the board of directors at the Company's most recent annual meeting of stockholders, no person that had previously served on the audit committee remained on the board of directors following the election. The board of directors has not made a final decision as to the members of the Audit Committee.

Because of these factors, additional time is required in order to prepare and review the Form 10-Q.

52.     In response, the price of BKF common stock declined, falling from a close of $32.63 per share on August 10, 2005 to $31.05 per share on August 11, 2005. Despite this partial disclosure, however, the full truth was not yet disclosed and BKF's stock price continued to be inflated.

53.     Within days, on August 13, 2005, the Company announced that defendant Levin would be replaced as CEO of the Company. Ten days later, on August 23, 2005, however, the Company also announced that it had structured a "new relationship" with defendant Levin that included retaining him as CEO of the Company until October 1, 2005, or until the Company retained a successor. Under the terms of the Company's agreement with Levin, he would also continue to serve as Chairman Emeritus (a non-voting advisor to the Board of Directors) and as a consultant to the Company. In addition, Levin would also "be involved" in a new investment management venture, in which BKF would have an economic interest. Under the arrangement, Levin's new venture would be permitted to solicit certain clients of the firm (representing approximately $2.5 billion of the firm's $12.4 billion in assets under management as of June 30, 2005) and occupy space at the Company's headquarters. Defendant Levin would also be authorized

to hire a limited number of the firm's employees closely involved with the management and administration of the accounts he would be authorized to solicit.

54.    On August 26, 2005, *The New York Post* called the deal with defendant Levin a "Consolation Prize." *The Post* stated that this arrangement gave Levin the opportunity to start a new hedge fund, "seeded by BKF's new management." *The Post* also pointed out that Levin would receive $30,000 per month for three years as compensation for his consultancy. According to *The Post*, one of the "most important" aspects of the deal is that the Company would also give Levin a "grubstake, although how much was not disclosed."

55.    On October 18, 2005, at 2:30 P.M., the Company announced the departure of key portfolio managers from its John A. Levin subsidiary due to a failure to negotiate compensation arrangements with the managers. The release stated, in part, the following:

> NEW YORK--(BUSINESS WIRE)--Oct. 18, 2005-- John A. Levin & Co., Inc. announced today the anticipated departure in the first half of 2006 of the senior portfolio managers of its event-driven investment strategy. The Company stated that, as a consequence, the portfolios of its event-driven investment vehicles will be liquidated and the funds will be returned to investors in a timely fashion. The liquidation will be conducted by the existing event-driven portfolio management team. As of June 30, 2005, Event Driven assets under management represented approximately 17% of total assets under management. For the six months ended June 30, 2005, Event Driven Investment Management Fees and Incentive Fees represented approximately 44% of total advisory revenue.
>
> **John C. Sic*iliano*, President and Chief Executive Officer of the firm, stated:** *"The decision to wind-up the funds was made following negotiations with all key event-driven investment personnel regarding compensation arrangements going forward.* While we are disappointed that we were not able to reach an agreement with any of them in a timely manner, the firm remains committed to offering a range of alternative investment strategies to our clients. The growth of our existing alternative investment strategies and the development of new strategies continue to be among our primary objectives. We appreciate the efforts made over many years by Frank Rango, Henry Levin and their entire investment team, as they played a key role in establishing our firm as a well-known provider of alternative investment strategies."

56.    The price of BKF common stock did not close materially lower on October 18, 2005 in response to the announced departures.

57.    Finally, on October 19, 2005, before the market opened, BKF issued a press release

announcing that it would restate its financial statements for 2004 and the quarter ended March 31,

2005:

> NEW YORK--(BUSINESS WIRE)--Oct. 19, 2005 BKF Capital Group, Inc. (NYSE: BKF)
> filed a Current Report on Form 8-K on October 17th reporting that on September 28, 2005
> BKF's management and the Audit Committee of the Board of Directors, in consultation
> with BKF's registered public independent accounting firm, Grant Thornton LLP, concluded
> to restate its previously issued consolidated financial statements for the year ended
> December 31, 2004 and the quarterly period ended March 31, 2005.
>
> The determination to restate these financial statements resulted from the accounting
> misclassification of certain restricted stock units ("RSU") on the Consolidated Statements of
> Financial Condition.
>
> Management has determined that the RSU grants should have been classified as additional
> paid-in capital on the date of grant with a corresponding increase to unearned compensation,
> with the expense over the vesting period reducing the unearned compensation balance.
>
> Management had previously accounted for the RSU as an increase to accrued incentive
> compensation and incentive compensation expense over the vesting period. The restatement
> will not result in any adjustment to the Consolidated Statements of Operations.
>
> Management has discussed these matters with Ernst & Young LLP, which audited BKF's
> financial statements for the fiscal year ended December 31, 2003, and Grant Thornton LLP,
> BKF's current auditors, each of which agrees with the proposed restatement.

58.    In response to this announcement, on October 19, 2005, BKF Capital stock

plummeted, falling over $7.40 per share in regular trading on the NYSE to $17.11 per share, a

decline of over 30%.

59.    On November 3, 2005, BKF issued a press release announcing that the SEC has

initiated an informal investigation into events surrounding the Company's restatement and the

departure of the senior portfolio managers.

## SUBSEQUENT DEVELOPMENTS

60.    The revelation of improper financial accounting and reporting also had a long-lasting

negative impact on the Company. On April 3, 2006, the Company announced that two senior

portfolio managers had notified defendants that they intend to cause the liquidation of certain

28

portfolios pursuant to then-existing agreements. Following the liquidation of these portfolios, the senior managers--Seth Turkeltaub and Richard Lodewick--would cease working for the Company. The departure of Turkeltaub and Lodewick had an adverse impact on the Company and investors, because the accounts managed by the two generated approximately 20.4% of the Company's revenues in 2005, and assets under management in the strategies managed by the team were approximately $615 million as of February 28, 2006. In 2005, the Company also liquidated its event driven portfolios, which generated approximately 41.3% of the Company's 2005 revenues, and experienced a decline in the assets under management of its long-only strategies of approximately $6.0 billion (or 62%).

61.    The announcement that these top managers would leave the Company caused shares of the Company to trade from $13.00 per share, on March 31, 2006, to a close of $10.94 the following trading day, a one-day decline of 15.8%.

62.    Moreover, in the weeks and months that followed, as investors digested the impact of these revelations, and as the adverse consequences of defendants' prior actions became manifest, shares of the Company traded even lower, reaching a low of less than $8.50 per share by April 24, 2006.  By May 11, 2006, shares traded to an intra-day low of $7.77, prices not seen in the stock since the late 1990s.  By the end of the first quarter of 2006, the Company had commenced the liquidation of its portfolios, assets under management had fallen to below $4.0 billion (from more than $13.1 billion a year earlier) the number of Company employees had fallen from 96 to 54 (falling to almost 10 by year-end), and its wholly-owned broker-dealer subsidiary was shutting down.

63.    Later, by the end of May 2006, BKF Capital received a Notice of Delisting from the NYSE, as the Company's total market capitalization and reported shareholder equity had fallen to

below $75 million, the market minimum.[1]  By July 24, 2006, shares of the Company traded to $4.00

per share, after the Company announced the resignation of its Chief Investment Officer, Philip W.

Friedman, and its exit from the long-only equity business.  Liquidation of the Company's long-only

equity portfolios would reduce the assets under management by BKF Capital to zero.

 64. As shares continued to trade below $4.00 per share, in late October 2006 defendants

also revealed additional material weaknesses in their financial reporting and operations.     On

October 27, 2006, defendants filed with the SEC an amended quarterly report for the second quarter

2006 that stated, in part, the following:

> In preparing its financial statements for the quarter ended June 30, 2006 but before
> filing with the SEC, BKF had originally determined to fully amortize the balance of
> its remaining $14.8 million of goodwill as a result of the separation of certain
> employees, including its Chief Investment Officer, from BKF during and shortly
> after the quarter ended June 30, 2006. Following its independent registered public
> accounting firm's review of these financial statements and after discussions with its
> independent registered public accounting firm, BKF determined it was appropriate
> to record a partial impairment of goodwill of $5.0 million during the quarter ended
> June 30, 2006, with the remaining balance to be amortized during the third quarter of
> 2006.
>
> On August 10, 2006, subsequent to filing its Form 10-Q for the quarter ended June
> 30, 2006, BKF was informed by its independent registered public accounting firm
> that the statement of operations included in its original filing of the Form 10-Q for
> the quarter ended June 30, 2006 (the "Original Form 10-Q") was not prepared in
> accordance with GAAP as a result of the incorrect placement of a line item. In the
> Original Form 10-Q, a subtotal line item labeled "Operating Income (Loss)" was
> placed prior to the line item for restructuring expenses in the 2006 Second Quarter
> Statement of Operations, which placement was not in accordance with GAAP.
> Rather, the line item for restructuring expenses should have been placed before
> subtotal line item labeled "Operating Income (Loss)." BKF's management agreed
> with the independent auditors assessment and, as a result, filed this amended Form
> 10-Q for the quarter ended June 30, 2006 was filed.
>
> On September 12, 2006, BKF received a letter from its independent registered public
> accounting firm indicating that such firm believed a material weakness in internal
> control over financial reporting related to BKF's ability to properly research,
> document and disclose non-routine transactions, existed during the quarter ended

---

[1] On or before September 5, 2006, BFK Capital shares were suspended from trading on the
NYSE.

June 30, 2006. The letter noted the material weakness was evidenced by the matters discussed above, namely, management's initial assessment of the amount of goodwill to be amortized in the quarter ended June 30, 2006 and the improper placement of a line item in the statement of operations.

In light of the matters discussed above management re-evaluated the effectiveness of the design and operation of BKF's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) and concluded that such controls and procedures were not effective during the quarter ended June 30, 2006.

65.    The market for BKF Capital's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, BKF Capital common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired BKF Capital common stocking upon the integrity of the market price of BKF Capital common stock and market information relating to BKF Capital, and have been damaged thereby.

66.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of BKF Capital common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

67.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about BKF Capital's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of BKF Capital and its business, prospects and operations, thus causing the Company's

common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## CAUSATION AND ECONOMIC LOSS

68.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated BKF Capital's stock price and operated as a fraud or deceit on Class Period purchasers of BKF Capital's stock by misrepresenting the Company's financial results. Over a period of approximately seventeen months, defendants engaged in improper accounting.

69.     Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of BKF Capital declined precipitously - - evidence that the prior artificial inflation in the price of BKF Capital's shares was eradicated. As a result of their purchases of BKF Capital stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

70.     By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of BKF Capital's business and future growth prospects. During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control the Company's financial reporting, and that such financial reports were prepared in accordance with GAAP. These claims caused and maintained the artificial inflation in BKF Capital's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

71.     Defendants' false and materially misleading statements had the intended effect of causing BKF Capital's shares to trade at artificially inflated levels throughout the Class Period - - reaching a Class Period high of over $40.00 per share during March 2005.

72.     Investors' first hint of defendants' wrongdoing came on August 10, 2005, when they learned that the Company was reconsidering the balance sheet accounting treatment of restricted stock units. Coupled with the later disclosure announcing a restatement on October 19, 2005, before the open of ordinary trading, these disclosures had adverse impact on the price of BKF Capital shares. These belated revelations evidenced defendants' prior falsification of BKF's financial results. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from BKF Capital's share price and were damaged as a result of the related share price decline.

## VIOLATIONS OF GAAP AND SEC REPORTING RULES

73.     During the Class period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

74.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R.  210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

33

in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

75.     SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

76.     In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> **Describe any known trends or uncertainties that have had or that the** *registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.* [Emphasis added.]

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> **The discussion and analysis shall focus specifically on material events and** *uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.* This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . . [Emphasis added.]

77.     The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. **To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.** [Emphasis added.]

78.     The Company's financial statements contained in the fiscal 2005 Form 10-K and/or the quarterly reports filed with the SEC on Forms 10-Q for the quarterly periods throughout the Class Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)    The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

79.    In addition, during the Class Period, defendants violated SEC disclosure rules:

(a)    defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)    by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. ' 210.4-01(a)(1).

80.    Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that the fiscal 2004 Form 10-K and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein. Had the true financial position and results of operations of the Company been disclosed during the Class period, the Company's common stock would have traded at prices well below that which it did.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

81.    At all relevant times, the market for BKF Capital's common stock was an efficient market for the following reasons, among others:

(a)    BKF Capital's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, BKF Capital filed periodic public reports with the SEC and the NYSE;

(c)    BKF Capital regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    BKF Capital was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

82.    As a result of the foregoing, the market for BKF Capital securities promptly digested current information regarding BKF Capital from all publicly available sources and reflected such information in BKF Capital stock price. Under these circumstances, all purchasers of BKF Capital common stock during the Class Period suffered similar injury through their purchase of BKF Capital common stock at artificially inflated prices and a presumption of reliance applies.

## ADDITIONAL SCIENTER ALLEGATIONS

83.    As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the truth regarding BKF, their control over, and/or receipt and/or modification of BKF's allegedly false and materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning BKF, participated in the fraudulent scheme alleged herein.

84.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including defendants.

## NO SAFE HARBOR

85.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BKF Capital who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

86.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by BKF Capital, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

87.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceived the investing public regarding BKF Capital's business, operations, management and the intrinsic value of BKF Capital common stock; (ii) artificially inflated the price of Company shares by issuing materially false and misleading statements; and (iii) caused plaintiff and other members of the Class to purchase BKF Capital common stock at artificially inflated prices.  In furtherance of this unlawful scheme,

plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

89.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for BKF Capital's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of BKF Capital as specified herein.

91.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BKF Capital's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BKF Capital and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BKF Capital common stock during the Class Period.

92.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or

40

directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

93.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing BKF Capital's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

94.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BKF Capital common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of BKF Capital's publicly-traded common stock were artificially inflated, and relying directly or

indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired BKF Capital common stock during the Class Period at artificially high prices and were damaged thereby.

95.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that BKF Capital was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their BKF Capital common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

97.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

98.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.    The Individual Defendants acted as controlling persons of BKF Capital within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101.    As set forth above, BKF Capital and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 18, 2007

LABATON SUCHAROW & RUDOFF LLP

By: _____
Christopher J. Keller (CK-2347)
Andrei V. Rado (AR-3724)
Alan I. Ellman (AE-7347)
100 Park Avenue, 12th Floor
New York, NY 10017
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

KAHN GAUTHIER SWICK, LLC
Lewis Kahn
Michael A. Swick
650 Poydras St., Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

Attorneys for Plaintiff

## CERTIFICATION

I, Thomas Richard Hudson Jr., Manager of Pirate Capital LLC, which is the investment advisor for the Jolly Roger Fund LP and Jolly Roger Offshore Fund LTD (the "Jolly Roger Funds"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of the Jolly Roger Funds. I have reviewed a complaint prepared against BKF Capital Group Inc. ("BKF") alleging violations of the federal securities laws;

2.    The Jolly Roger Funds did not purchase securities of BKF at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    The Jolly Roger Funds are willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    The Jolly Roger Funds' transactions in the securities of BKF as reflected in Exhibit A, are attached hereto;

5.    The Jolly Roger Funds have not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years;

6.    Beyond its pro rata share of any recovery, the Jolly Roger Funds will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this $\mathcal{2O}$ day of March, 2007.

Thomas Richard Hudson Jr.
Manager
Pirate Capital LLC

## EXHIBIT A
## TRANSACTIONS IN BKF CAPITAL GROUP INC.

| Transaction Type (Purchase/Sale) | Trade Date | No. Of Shares | Price per share | | Cost/Proceeds | |
|---|---|---|---|---|---|---|
| Buy | 09/10/04 | 500.00 | $ | 28.34 | $ | (14,170.00) |
| Buy | 09/10/04 | 500.00 | $ | 28.35 | $ | (14,175.00) |
| Buy | 09/27/04 | 1,000.00 | $ | 28.35 | $ | (28,350.00) |
| Buy | 09/30/04 | 500.00 | $ | 29.00 | $ | (14,500.00) |
| Buy | 10/12/04 | 100.00 | $ | 30.74 | $ | (3,074.00) |
| Buy | 10/12/04 | 5,000.00 | $ | 30.90 | $ | (154,500.00) |
| Buy | 10/12/04 | 5,000.00 | $ | 31.25 | $ | (156,250.00) |
| Buy | 10/12/04 | 2,100.00 | $ | 30.75 | $ | (64,575.00) |
| Buy | 10/12/04 | 300.00 | $ | 30.49 | $ | (9,147.00) |
| Buy | 10/12/04 | 4,200.00 | $ | 30.50 | $ | (128,100.00) |
| Buy | 10/12/04 | 400.00 | $ | 31.24 | $ | (12,496.00) |
| Buy | 10/12/04 | 5,000.00 | $ | 31.15 | $ | (155,750.00) |
| Buy | 10/12/04 | 4,600.00 | $ | 31.25 | $ | (143,750.00) |
| Buy | 10/19/04 | 600.00 | $ | 29.99 | $ | (17,994.00) |
| Buy | 10/19/04 | 4,400.00 | $ | 30.00 | $ | (132,000.00) |
| Buy | 10/19/04 | 300.00 | $ | 29.90 | $ | (8,970.00) |
| Buy | 11/02/04 | 5,000.00 | $ | 32.00 | $ | (160,000.00) |
| Buy | 11/29/04 | 5,000.00 | $ | 32.85 | $ | (164,250.00) |
| Buy | 11/29/04 | 1,700.00 | $ | 32.15 | $ | (54,655.00) |
| Buy | 11/29/04 | 5,000.00 | $ | 32.30 | $ | (161,500.00) |
| Buy | 11/29/04 | 5,000.00 | $ | 32.55 | $ | (162,750.00) |
| Buy | 11/29/04 | 5,000.00 | $ | 32.65 | $ | (163,250.00) |
| Buy | 11/29/04 | 5,000.00 | $ | 33.00 | $ | (165,000.00) |
| Buy | 11/29/04 | 5,000.00 | $ | 33.00 | $ | (165,000.00) |
| Buy | 11/30/04 | 5,000.00 | $ | 32.10 | $ | (160,500.00) |
| Buy | 11/30/04 | 5,000.00 | $ | 32.05 | $ | (160,250.00) |
| Buy | 12/07/04 | 500.00 | $ | 32.51 | $ | (16,255.00) |
| Buy | 12/13/04 | 4,900.00 | $ | 32.10 | $ | (157,290.00) |
| Buy | 12/15/04 | 100.00 | $ | 32.68 | $ | (3,268.00) |
| Buy | 12/15/04 | 20,000.00 | $ | 33.93 | $ | (678,604.00) |
| Buy | 12/15/04 | 4,700.00 | $ | 33.25 | $ | (156,275.00) |
| Buy | 12/15/04 | 200.00 | $ | 33.19 | $ | (6,638.00) |
| Buy | 12/15/04 | 5,900.00 | $ | 33.93 | $ | (200,188.18) |
| Buy | 12/23/04 | 200.00 | $ | 35.51 | $ | (7,102.00) |
| Buy | 12/27/04 | 7,000.00 | $ | 36.00 | $ | (251,976.20) |
| Buy | 12/28/04 | 1,300.00 | $ | 36.00 | $ | (46,800.00) |
| Buy | 03/16/05 | 500.00 | $ | 40.49 | $ | (20,245.00) |
| Buy | 03/16/05 | 200.00 | $ | 40.48 | $ | (8,096.00) |
| Buy | 03/16/05 | 5,000.00 | $ | 40.25 | $ | (201,250.00) |
| Buy | 03/16/05 | 4,300.00 | $ | 40.50 | $ | (174,150.00) |
| Buy | 03/17/05 | 5,000.00 | $ | 39.80 | $ | (199,000.00) |
| Buy | 03/17/05 | 1,100.00 | $ | 39.60 | $ | (43,560.00) |
| Buy | 03/17/05 | 600.00 | $ | 39.60 | $ | (23,760.00) |
| Buy | 03/17/05 | 5,000.00 | $ | 39.70 | $ | (198,500.00) |

| Buy | 03/31/05 | 200.00 | $ | 40.00 | $ | (8,000.00) |
|-----|----------|--------|---|-------|---|------------|
| Buy | 03/31/05 | 1,000.00 | $ | 39.99 | $ | (39,990.00) |
| Buy | 03/31/05 | 400.00 | $ | 39.95 | $ | (15,980.00) |
| Buy | 04/01/05 | 21,300.00 | $ | 39.98 | $ | (851,493.06) |
| Buy | 04/07/05 | 5,000.00 | $ | 40.50 | $ | (202,500.00) |
| Buy | 04/26/05 | 5,000.00 | $ | 35.20 | $ | (176,000.00) |
| Buy | 04/26/05 | 5,000.00 | $ | 35.45 | $ | (177,250.00) |
| Sale | 04/22/05 | (6,200.00) | $ | 38.00 | $ | 235,600.00 |
| Sale | 04/22/05 | (3,300.00) | $ | 38.00 | $ | 125,400.00 |
| Sale | 04/22/05 | (2,600.00) | $ | 38.00 | $ | 98,800.00 |
| Sale | 04/22/05 | (900.00) | $ | 38.01 | $ | 34,209.00 |
| Sale | 04/22/05 | (700.00) | $ | 38.02 | $ | 26,614.00 |
| Sale | 06/14/05 | (9,000.00) | $ | 38.51 | $ | 346,623.30 |
| Sale | 06/15/05 | (6,000.00) | $ | 38.50 | $ | 231,000.00 |
| Sale | 06/17/05 | (9,800.00) | $ | 39.25 | $ | 384,651.96 |
| Sale | 06/17/05 | (20,300.00) | $ | 39.25 | $ | 796,779.06 |
| Sale | 06/20/05 | (2,000.00) | $ | 39.25 | $ | 78,500.00 |
| Sale | 08/24/05 | (15,000.00) | $ | 34.23 | $ | 513,375.00 |
| Sale | 08/25/05 | (7,000.00) | $ | 34.98 | $ | 244,885.20 |
| Sale | 09/07/05 | (900.00) | $ | 33.54 | $ | 30,184.02 |
| Sale | 09/19/05 | (500.00) | $ | 30.82 | $ | 15,410.00 |
| Sale | 09/28/05 | (57,900.00) | $ | 32.25 | $ | 1,867,280.79 |
| Sale | 10/03/05 | (5,800.00) | $ | 31.03 | $ | 179,976.90 |